UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LUCILLE A. CHANDONNETT,          :
     Plaintiff,              :
                                 :

     v.                       :          CA 03-387 M

                                  :
JO ANNE B. BARNHART,             :
COMMISSIONER,                    :
SOCIAL SECURITY ADMINISTRATION,  :
     Defendant.              :

**MEMORANDUM AND ORDER**

This matter is before the court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB"), under §§ 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) ("the Act"). Plaintiff Lucille A. Chandonnett ("Plaintiff") has filed a motion for summary judgment, or alternatively, for remand. Defendant Jo Anne B. Barnhart ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

With the parties' consent, the case has been referred to this Magistrate Judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence in the record. Accordingly, based on the following analysis, I order that Plaintiff's Motion for Summary Judgment, or Alternatively, for Remand (Document ("Doc.") #6) ("Motion for Summary Judgment") be granted to the extent that the matter be remanded for further administrative proceedings. I further order that Defendant's Motion for Order Affirming the Commissioner's Decision (Doc. #7) ("Motion to Affirm") be denied.

## Procedural History

Plaintiff made a protective filing of an application for DIB on September 28, 2000, alleging disability as of April 1, 2000, due to cervical stenosis, occipital neuralgia, and arthritis. (Record ("R.") at 108, 113)  The application was denied initially (R. at 59, 61) and on reconsideration (R. 60, 66).  Plaintiff timely requested a hearing before an administrative law judge ("ALJ") (R. at 70), which was held on December 4, 2001 (R. at 25-58).

On December 26, 2001, the ALJ issued a decision in which he found that Plaintiff was not disabled and, therefore, not entitled to a period of DIB.  (R. at 15-24)  Plaintiff appealed the ALJ's decision to the Appeals Council (R. at 11), which on July 18, 2003, declined Plaintiff's request for review (R. at 6-7), thereby rendering the ALJ's decision the final decision of the Commissioner (R. at 6).

Plaintiff filed a Complaint (Doc. #1) in this court on September 8, 2003.  Defendant on November 12, 2003, filed her Answer (Doc. #2) to the Complaint, and both parties subsequently consented to the exercise of jurisdiction by a magistrate judge. On April 12, 2004, Plaintiff filed the Motion for Summary Judgment.  Defendant filed the Motion to Affirm on April 30, 2004.  Plaintiff filed a Reply Brief (Doc. #10) on September 10, 2004.[1]

## Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the

---

[1] On August 20, 2004, Plaintiff's Motion to File Reply Brief out of Time (Doc. #8) was filed.  Plaintiff stated that through inadvertence the reply brief had not been timely filed.  See id.  The court granted leave to file the reply brief on August 27, 2004.  See Doc. #9.

record and is legally correct.

## Background

Plaintiff, born on December 13, 1951, was forty-nine years old at the time of the hearing.  (R. at 25, 37, 103)  She has a high school education (R. at 37, 119) and past relevant work experience as a jewelry epoxy painter, sales clerk, and custodian.  (R. at 16, 21, 114, 122)

## Medical Evidence

The record contains the following exhibits: a report of an MRI (May 2, 2000) (R. at 145-47); a transcription of initial consultation notes of Curtis Doberstein, M.D. (August 3, 2000) (R. at 148); a letter to Todd Viccione, M.D. (August 30, 2000) (R. at 149-50), and physical therapy records from Judith M. Ricci, M.S., P.T. (October 3, 2000) (R. at 240-44); patient records from Joseph V. Centofanti, M.D. (April 28, 2000-September 14, 2000) (R. at 151-60, 238-39); a Physical Residual Functional Capacity ("RFC") Assessment and a Rhode Island Disability Determination Services ("DDS") Case Review Form completed by Rhode Island DDS medical consultant Edward R. Hanna, M.D. (October 24, 2000) (R. at 161-70); a Physical RFC Assessment and Rhode Island DDS Case Review Form completed by John R. Bernardo, M.D. (November 28, 2000) (R. at 171-80); treatment records, a physical capacity evaluation, a pain questionnaire, and a medical questionnaire from Dr. Viccione (March 27, 2000-February 22, 2001) (R. at 181-216, 250-53); screening reports and a supplemental questionnaire as to RFC from Lucille C. Frieder, Ph.D. (March 2, 2001-April 1, 2001) (R. at 217-23); examination records, laboratory test results, a physical capacity evaluation, a pain questionnaire, and a medical questionnaire from Wendy G. Clough, M.D. (March 8, 2001-May 31, 2001) (R. at 224-30, 233-37); a psychological evaluation report by Lee-Ann Markowski, C.A.G.S., and Louis Turchetta, Ed.D. (August 20, 2001) (R. at 245-49); and

a supplemental questionnaire as to RFC and a psychological test report from John P. Parsons, Ph.D., B.C.F.E. (November 19, 2001) (R. at 254-62).

### Administrative Hearing

Plaintiff, represented by counsel, appeared at the December 4, 2001, hearing. (R. at 25, 27) The ALJ explained the purpose of the hearing and identified the exhibits which were received into evidence. (R. at 27-28)

Plaintiff's counsel then made an opening statement which began with Plaintiff's age, education level, and past occupations. (R. at 28-29) She described the progression of Plaintiff's physical impairments and the doctors whom Plaintiff had seen regarding these problems. (R. at 29-29) Counsel noted that Plaintiff was evaluated at the request of the Social Security Administration by Dr. Turchetta who diagnosed a mood disorder secondary to her medical problems, that Plaintiff was later evaluated by Dr. Frieder who diagnosed major depression, and that Plaintiff was sent by her attorney to be evaluated by Dr. Parsons who also diagnosed major depression. (R. at 29-30) Plaintiff's attorney described the effects of the mental impairments and submitted that the combination of her physical impairments, mental impairments, and pain would make it impossible for Plaintiff to perform any kind of work. (R. at 30)

Medical Expert ("ME") Shahzad Rahman, M.D., testified. (R. at 30-36, 56-57) He summarized the salient features of the medical record, including the physicians' reports of occipital neuralgia, cervical stenosis, fibromyalgia, chronic fatigue syndrome, and depression. (R. at 31-32) The ME noted that there were no psychiatric treatment records but there were three psychiatric consultative examinations which spoke of major depression. (R. at 32) He listed some of Plaintiff's recorded symptoms which were consistent with major depression. (R. at 32)

He observed that Plaintiff's mental and physical impairments were
not easily separated because they had overlapping symptomatology.
(Id.)  With regard to whether psychiatric treatment would benefit
Plaintiff, the ME indicated ambivalence.  (Id.)  He stated that
he was unable to express an opinion as to whether the record
demonstrated an impairment or combination of impairments which
met or equaled a listed impairment, noting that the medical
records regarding Plaintiff's mental impairment were episodic and
not continuous.  (R. at 33)  However, using a Supplemental
Questionnaire as to Residual Functional Capacity (R. at 254) as a
guide, the ME opined that Plaintiff was moderately severely
impaired in the ability to understand, carry out, and remember
complex instructions and moderately impaired in: the ability to
understand, carry out, and remember very simple instructions; the
ability to relate to other people; the performance of daily
activities and pursuit of interests; and the ability to respond
appropriately to co-workers, supervision, and work pressure.  (R.
at 34)  He stated that Plaintiff had no deterioration in her
personal habits.  (Id.)  With regard to Plaintiff's ability to
perform tasks, the ME opined that Plaintiff had a mild impairment
in completing simple tasks, a moderately severe restriction in
performing complex tasks, a moderate restriction in completing
repetitive tasks, and a mild to moderate impairment in performing
varied tasks.  (Id.)  He also indicated that these limitations
were attributable to Plaintiff's depression and that it was
"quite safe to assume" (R. at 35) that they predated March 2001
(the date of Plaintiff's first psychological examination) by six
months (id.).  Regarding this assumption, the ME explained that
Plaintiff's chronic fatigue syndrome, occipital neuralgia, and
chronic pain "have been brewing for a while ...." (R. at 35).  At
the same time, the ME opined that these physical problems would
tend to limit Plaintiff's physical functioning more than her

mental functioning.  (R. at 35-36)

The ALJ asked the ME whether the record supports the conclusion that Plaintiff would not be able to complete a full day of employment even at the sedentary exertional level.  (R. at 36)  The ME responded by referring to Dr. Clough's opinion that Plaintiff could not sustain competitive employment on a full-time, ongoing basis, explaining that he respected Dr. Clough because of her experience in treating patients with "fibromyalgia and chronic fatigue, et cetera ...."  (R. at 36)  Plaintiff's attorney posed a similar question near the end of the hearing, asking the ME whether it was his opinion that Plaintiff is not capable of lasting a whole day at work.  (R. at 56)  The ME, again citing Dr. Clough's opinion plus Plaintiff's testimony that she could not function without a nap, opined that it was not likely Plaintiff could last a whole day at work (R. at 56-57) and agreed that this opinion would be consistent with the record (R. at 57).

Plaintiff testified to the following facts.  She lived in a two-story house with her twenty-one year old daughter and twenty year old son.  (R. at 37)  She completed the eleventh grade and received her general equivalency diploma ("GED").  (Id.)  After obtaining her GED, Plaintiff worked as a hairdresser.  (Id.)  Thereafter, she worked in the jewelry industry, first as a sorter and later, for seven years, as jewelry painter and supervisor.  (R. at 39-40)  Each of these three jobs involved both standing and sitting and lifting/carrying boxes up to thirty pounds.  (R. at 40)

Plaintiff's last job was as a school custodian, and she was so employed for five or six years.  (R. at 38)  In addition to cleaning the school, Plaintiff maintained the boiler, being licensed to do so.  (Id.)  The position required her to lift cleaning supplies and buckets filled with water, but nothing

6

weighing more than forty or fifty pounds.  (Id.)  Plaintiff left
the position when she became sick a little over a year prior to
the hearing.  (R. at 39)

     Plaintiff testified that she did not think she could work
because she was in severe pain and could no longer function.  (R.
at 40)  She stated that her head and hands were always numb and
that her hands were swollen.  (Id.)  She had pain in her neck,
back, arms, and spine.  (Id.)  When she walked, her legs felt
like they were burning.  (R. at 40)  She had trouble walking, she
could not do her own housework, and she relied on her children to
do everything.  (Id.)  She indicated that she could not take a
shower normally because she was "off balance" (R. at 41) while
trying to get into the bathtub (id.).  Although the pain was
constant, Plaintiff experienced the most pain upon waking in the
morning when she first started to move.  (Id.)  On some occasions
her children assisted.  (R. at 46)  She related that getting
dressed was difficult, indicating that she was unable to bend
because when she did she felt as if she were going to fall.  (R.
at 43)  She also reported that she had to wear glasses, but "they
don't even help."  (R. at 40)

     Plaintiff further related that she needed her children or
friends to help her shop for groceries.  (R. at 43)  Although she
still held a driver's license, she only drove once every month or
two and then only short distances.  (R. at 43, 49)  Even this
limited amount of driving was difficult because of the severe
pain which she experienced.  (R. at 43-44)  As a result, she
relied on her children and friends for transportation.  (R. at
43)  Plaintiff related that on average she slept for about three
hours a night and napped for an hour or two each day, but her
sleep was not sound as she was always twisting and turning.  (R.
at 44)

     Plaintiff also testified about her social activities.  (R.

7

at 44-45)  She did not have many friends and did not regularly
see people other than her children as much as previously.  (Id.)
Plaintiff said that on occasion her friends would pick her up and
take her to their homes or out somewhere, but that the last time
she left her house to go out with a friend was, perhaps, three
weeks prior to the administrative hearing.  (R. at 45)

Concerning her daily activities, Plaintiff stated that her
average day started with getting up, going to the bathroom to
wash, and sitting in her living room or at the kitchen table.
(Id.)  Plaintiff explained that she avoided moving too much right
after getting out of bed because of pain and being "off from
laying down" (R. at 46) and would take several breaks while
performing her morning routine.  (Id.)  She or her son would
usually make her something simple for breakfast, but she often
did not eat during the day because the pain made her sick to her
stomach.  (Id.)  Her daughter normally made dinner, but if it
were something small Plaintiff would cook her own meal.  (R. at
47)  As for the remainder of the day, Plaintiff watched
television but did not always follow the programs, talked to a
friend or relative, or read magazines, although she indicated
that she could not read much anymore because she had problems
focusing.  (R. at 46-47)  She related that there are activities
that she enjoyed but could no longer do such as taking long
walks, dancing, being with friends, and cooking.  (R. at 47)
Plaintiff also testified that she had no income of her own and
had been using her savings to pay her expenses.  (R. at 49)  She
related that the last time she had a regular income was when she
was last employed around February 2000.  (Id.)

The ALJ questioned Plaintiff about the medications which she
took.  (R. at 49-50)  Plaintiff's attorney responded that the
only medication Plaintiff was then taking was Celebrex.  (R. at
50)  Plaintiff said that she was not taking any over-the-counter

8

medicines since nothing alleviates her pain but could not remember when was the last time she had taken any medicine other than Celebrex. (Id.)

With regard to her mental impairments, Plaintiff related that she felt depressed, frequently cried because she was in so much pain, had memory problems, and had trouble concentrating and focusing. (R. at 41-42)  She said that her children did her cleaning and laundry and that her daughter helped her in writing checks. (R. at 42)  Even with this assistance, she sometimes became confused and made mistakes when writing the checks. (R. at 42)

Plaintiff acknowledged that she had been seen by three psychologists for the purpose of evaluating her alleged mental impairments for Social Security benefits. (R. at 50-51)  She stated that she felt affected by depression but that she had been told to hold off on getting treatment until she had been evaluated by the other specialists. (R. at 51)  Plaintiff was unable to recall which doctor had given her this direction. (Id.)  The ALJ, noting that Dr. Frieder had written that Plaintiff "would benefit from psychiatric evaluation, psychotherapy[,] and might be a candidate for treatment with anti-depressant medications" (R. at 51), asked if Dr. Frieder had discussed such treatment with Plaintiff (id.). Plaintiff responded affirmatively, but indicated that she thought she was supposed to see other doctors first, that she did not know which doctor to call for treatment, and that she believed she had to see another doctor for medication. (R. at 52)  When asked by the ALJ if anyone other than Dr. Frieder had suggested that she see a psychiatrist or psychologist for treatment as opposed to just for an evaluation, Plaintiff replied: "Not that I remember." (Id.)  During a re-examination by her attorney, Plaintiff agreed that her depression might be connected to her fibromyalgia, chronic

9

fatigue syndrome, and neuralgia and expressed the hope that if these physical problems were resolved her depression might be alleviated as well.  (Id.)

Vocational Expert ("VE") Kenneth R. Smith also testified. (R. at 50, 52-57)  Prior to giving an opinion regarding the skill and exertional level of Plaintiff's past work, the VE questioned Plaintiff directly regarding her work as a jewelry epoxy painter. (R. at 53-54)  Plaintiff explained that in that job she lifted boxes or paint containers many times a day.  (R. at 54)  After obtaining this information, the VE characterized Plaintiff's prior jobs: the school custodian position was semiskilled work at the medium exertional level; the job of jewelry epoxy painter was unskilled work at the sedentary exertional level according to the Dictionary of Occupational Titles ("DOT"), although he allowed that as performed by Plaintiff it may have been at the light exertional level; and the other jobs in the jewelry industry performed by Plaintiff were unskilled and at least within the light exertional level if not the medium level because of the box lifting.  (R. at 54-55)  In response to a question from the ALJ, the VE clarified that carding in the jewelry industry was usually a sedentary job.  (R. at 55)

After receiving this information, the ALJ propounded the following hypothetical to the VE:

> [C]onsider a hypothetical claimant, same age, education and work experience of this claimant ... residual functional capacity for sedentary work, but limited by severe restrictions with respect to understanding, memory and carrying out complex or detailed job instructions and moderate[2] restrictions with respect to maintaining attention and concentration, dealing appropriately with coworkers or supervisors or the public and in dealing with expectations of attendance perseverance ....  With

---

[2] The ALJ defined a moderate restriction as one which affects, but does not preclude functioning in the described area.  (R. at 55)

those restrictions, would the hypothetical claimant be able to perform any of the work the claimant performed in the past?

(R. at 55)  The VE responded that such a claimant would be able to perform Plaintiff's past work as a jewelry epoxy painter as defined in the DOT, such job being unskilled and allowing moderate restrictions.  (Id.)  The VE also identified other jobs in the regional economy that such a claimant could perform and the number of positions available: assembler with 1,500 positions, inspector with 600 jobs, and hand packager with 1,000 positions.  (R. at 56)  All of these jobs were sedentary and unskilled.  (Id.)

The ALJ then inquired of the VE whether the requirement of a significant period of recumbent rest during the day for the hypothetical claimant would preclude employment to which the VE responded in the affirmative.  (Id.)  The ALJ also asked whether the hypothetical claimant would be precluded from employment if the impairments the ALJ had described as being moderate were moderately severe.  (Id.)  The VE opined that she would.  (Id.) The ALJ then concluded the hearing.  (R. at 58)

### Standard of Review

The court's function in reviewing the Commissioner's decision is a narrow one.  See Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The court does not reconsider facts or re-weigh the evidence.  See Schoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001); see also Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts."); Lopez v. Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998)("In reviewing the record, the district court must avoid reinterpreting the evidence

or otherwise substituting its own judgment for that of the Secretary."). The decision "will be overturned only if it is not supported by substantial evidence,[3] or if it is based on legal error." Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995); see also Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987). If supported by substantial evidence in the record, the Commissioner's decision must be upheld even if the record could arguably support a different conclusion. See 42 U.S.C. § 405(g) (2003)(2005 Supp.); Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 131 (1st Cir. 1981) ("Although we as the trier of fact might have reached an opposite conclusion, we cannot say that a reasonable mind could not have decided as did the Secretary ....").

### Errors Claimed

Plaintiff alleges that the ALJ erred in: (1) according little evidentiary weight to the opinion of Dr. Clough; (2) concluding that Drs. Frieder and Parsons overstated Plaintiff's mental impairment and resulting functional limitations; and (3) finding that Plaintiff's subjective complaints regarding her physical and mental limitations were not totally credible. See Plaintiff's Memorandum in Support of Motion for Order Reversing Decision of the Commissioner ("Plaintiff's Mem.") at 11, 14, 18.

### Discussion

**I.   The ALJ's Decision**

To qualify for DIB, a claimant must meet certain insured

---

[3] The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also Lopez v. Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998); Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

status requirements,[4] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act.  See 42 U.S.C.A. § 423(a) (2003) (2005 Supp.).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C.A. § 423(d)(1)(A).  A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C.A. § 423(d)(2)(A).  A severe impairment is defined as one which significantly limits an individual's ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c) (2005); see also Bowen v. Yuckert, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987).  The Commissioner is directed to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C.A. § 423(d)(2)(B).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

Following the familiar sequential evaluation,[5] the ALJ in

---

[4] Plaintiff had acquired sufficient quarters of coverage to remain insured through the date of the Administrative Law Judge's decision. (R. at 16, 22)

[5] The Social Security regulations prescribe a five-step inquiry for determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a) (2005); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Secretary must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe

the instant case found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (R. at 16, 23)  He determined that Plaintiff's impairments, namely cervical disc disease, occipital neuralgia, fibromyalgia, chronic fatigue syndrome, and depression, were severe but did not meet or equal a listed impairment.  (R. at 17-18, 23)  The ALJ found that Plaintiff retained the RFC to perform a wide range of sedentary work.  (R. at 19, 23)  Specifically, the ALJ determined that Plaintiff could perform work that requires lifting no more than ten pounds occasionally, standing and/or walking up to two hours in an eight-hour workday, and sitting for up to six hours in an eight-hour workday.  (Id.)  However, the ALJ also determined that Plaintiff had a severe restriction in her ability to understand, remember, and carry out complex or detailed instructions and moderate restrictions in her ability to: maintain attention and concentration; deal appropriately with the public, co-workers, and supervisors; and deal appropriately with the ordinary requirements of attendance, perseverance, and pace.  (Id.)  He found that Plaintiff's past relevant work as a jewelry epoxy painter did not require performance of work-related activities which were precluded by these limitations.  (R. at 23)  Thus, the ALJ determined that Plaintiff's impairments did not prevent her from performing her past relevant work and concluded that Plaintiff was not disabled as defined in the Act.  (R. at 22, 23)

---

impairment; (3) whether her impairment meets or equals one of the Secretary's listed impairments; (4) whether the claimant is able to perform her past relevant work; and (5) whether the claimant remains capable of performing any work within the economy.  See 20 C.F.R. § 404.1520(b)-(f) (2005).  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001); see also Seavey, 276 F.3d at 5.

## II.  **Analysis**

### A.   **The Weight Given to Dr. Clough's Opinion**

The ALJ accorded little evidentiary weight to Dr. Clough's opinion that Plaintiff's functional limitations were greater than those recognized in a sedentary profile.  (R. at 20)   Among other significant restrictions, Dr. Clough fixed the length of time that Plaintiff could sit and/or stand before needing to lie down as being one hour.  (R. at 234)

In deciding to afford little weight to Dr. Clough's opinion, the ALJ explained that Dr. Clough's finding lacked objective support.  (R. at 20)  He described her as being "essentially ... an examining physician ..." (id.), who "perform[ed] a one-time evaluation" (id.).  Although the ALJ recognized that Plaintiff had also returned for a follow-up visit with Dr. Clough a month later (id.), the ALJ saw "no indication that Dr. Clough would be serving as a treating physician" (id.).  The ALJ noted that Dr. Clough did not have the benefit of a significant longitudinal treatment record despite the chronic nature of Plaintiff's complaints and that the doctor had not provided any "specific rationalization of her conclusions beyond a general reference to the claimant's pain and fatigue."  (Id.)

Title 20, § 404.1527 of the Code of Federal Regulations ("C.F.R.") dictates that in deciding the weight to give any medical opinion, the ALJ is to consider all of the following factors: (1) the examining relationship; (2) the treatment relationship, including its length, nature, and extent; (3) the supportability of the opinion using medical signs and laboratory findings; (4) the consistency of the opinion with the rest of the record; (5) the specialization of the physician giving the opinion; and (6) other factors which tend to support or contradict the opinion.  See 20 C.F.R. § 404.1527(d) (2005).  The C.F.R. also cautions that "[m]edical source opinions on issues

15

reserved to the Commissioner ... are not medical opinions ... because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(e). For example, "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(e)(1).

The ALJ's reasons for discounting Dr. Clough's opinion are for the most part valid.[6] Dr. Clough did not have the benefit of any other physician's records (R. at 225), she was largely dependent upon what Plaintiff reported to her in formulating her opinion (R. at 224-26, 233-37), and her findings were, at best, only minimally supported (R. at 20). As for the ALJ's characterization of Dr. Clough as "essentially ... an examining physician" (R. at 20), this seems to minimize the doctor's relationship with Plaintiff beyond that which the record permits. Dr. Clough saw Plaintiff on two occasions (R. at 224, 233), she prescribed Celebrex for Plaintiff (R. at 233, 236), and Plaintiff was scheduled to see her the day after the hearing (R. at 50).[7]

---

[6] The ALJ stated that "Dr. Clough has little basis for assessing the claimant's functional limitations back to April 2000 ...." (R. at 20) As to this statement, the court agrees with Plaintiff that "Dr. Clough never purported to render an opinion regarding [Plaintiff's] condition from April of 2000 ...." Plaintiff's Memorandum in Support of Motion for Order Reversing Decision of the Commissioner ("Plaintiff's Mem.") at 11.

[7]

ATTY: Your Honor, the claimant told me that the only medication she has at this point in time is the Celebrex, and you'll note that that has been prescribed by Dr. Chlo [sic], 200 milligrams, [R. at 236], is when she -- is where you find that. She does have an appointment with Dr. --

CLMT: Yeah, tomorrow.

ATTORNEY: Tomorrow at which time, obviously there's going to be a review.

16

However, this is not a case where the ALJ confused an examining physician with a treating physician or vice-versa.  Such a mistake has caused the court in some circumstances to grant a motion for remand.  Here, disregarding the label which he used to describe it, the ALJ appears to have understood the extent of Plaintiff's relationship with Dr. Clough and to have taken it into consideration in determining the weight to give to her opinion.  While the record warrants Dr. Clough being classified as a treating physician, she is not so far removed from the border of that category that the ALJ's characterization of her as "essentially ... an examining physician" (R. at 20) is an error warranting remand.

Nevertheless, the court sees a significant deficiency in the record.  Dr. Clough's opinion that Plaintiff can only sit and/or stand for one hour before needing to lie down (R. at 234) is uncontroverted.  Additionally, the ALJ's finding that Plaintiff's RFC allows her to perform a wide range of sedentary work, including the ability to "sit for up to six hours in an eight hour workday" (R. at 23), despite her fibromyalgia and chronic fatigue syndrome, is unsupported by any assessment from a physician.  The two DDS medical consultants, Dr. Hanna and Dr. Bernardo, who reviewed the record and who rendered RFC findings, did so before Dr. Clough had examined Plaintiff and made the diagnosis of fibromyalgia and chronic fatigue syndrome.  (R. at 161-70, 171-80, 224-30, 233-37)  Thus, neither DDS doctor could have considered the effect these illnesses might have on Plaintiff's RFC.

An ALJ is not at liberty to substitute his own views for uncontroverted medical opinion.  See Nguyen v. Chater, 172 F.3d

---

(R. at 50)  In the court's view, a scheduled appointment with a physician to review prescribed medication is evidence of a treating relationship.

31, 35 (1st Cir. 1999).  The United States Court of Appeals for
the First Circuit has held "that where an ALJ reaches conclusions
about claimant's physical exertional capacity without any
assessment of residual functional capacity by a physician, the
ALJ's conclusions are not supported by substantial evidence ...."
Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st
Cir. 1991); see also Rivera-Figueroa v. Sec'y of Health & Human
Servs., 858 F.2d 48, 52 (1st Cir. 1988)(questioning ALJ's ability
to assess claimant's physical capacity unaided even by an RFC
from a nonexamining doctor); Rivera-Torres v. Sec'y of Health &
Human Servs., 837 F.2d 4, 6 (1st Cir. 1988)(noting the absence of
any useful RFC from even a nonexamining physician).

What makes the deficiency especially problematic in the
instant matter is the ME's testimony at the hearing.  Asked by
the ALJ if the record supported the conclusion that Plaintiff
would be unable to complete a full day of employment even at the
sedentary level of exertion, the ME, Dr. Rahman, responded by
stating that he deferred to Dr. Clough, indicating that he
respected her opinion because he knew her "to be a very good
resource in the community for fibromyalgia and chronic fatigue
...."  (R. at 36)  Dr. Rahman further testified that based on the
evidence it was not likely that Plaintiff would be able to last
a whole day at work.  (R. at 56)  The ALJ elected to give little
weight to this part of Dr. Rahman's testimony because it was
offered outside of his specialty of psychiatry.  (R. at 21, 31)
While this is a valid basis for discounting a physician's
opinion, here Dr. Rahman appears to have been the only physician
who had reviewed the entire record.  Given that neither DDS
doctor had considered Dr. Clough's findings and reports in
formulating their assessment of Plaintiff's RFC and the ME's
testimony that it was unlikely Plaintiff could perform a full
day of work, the court believes that the ALJ should have had a

18

qualified physician review Plaintiff's entire medical record and
provide an RFC assessment based on that review.  See Heggarty v.
Sullivan, 947 F.2d 990, 997 (1st Cir. 1991)(noting the
Commissioner's responsibility to develop evidence and that this
responsibility increases "where there are gaps in the evidence
necessary to a reasoned evaluation of the claim, and where it is
within the power of the [ALJ], without undue effort, to see that
gaps are somewhat filled--as by ... requesting further assistance
from a social worker or psychiatrist or key witness").
Accordingly, for the reasons stated above, the court finds that
the ALJ's determination that Plaintiff has the RFC to perform a
wide range of sedentary work is not supported by substantial
evidence.

   **B.   The ALJ's Assessment of Plaintiff's Mental Impairment**

   At step two, the ALJ found that Plaintiff suffered from
depression.  (R. at 17)  The ALJ subsequently determined that
Plaintiff had: 1) a severe restriction in her ability to
understand, remember, and carry out complex or detailed
instructions; 2) a moderate restriction in her ability to
maintain attention and concentration; 3) a moderate restriction
in her ability to deal appropriately with the public, co-workers,
and supervisors; and 4) a moderate restriction in her ability to
deal appropriately with the ordinary requirements of attendance,
perseverance and pace.  (R. at 23)  The ALJ concluded that the
opinions offered by Drs. Frieder and Parsons overstated
Plaintiff's impairments and were entitled to diminished
evidentiary weight and that Dr. Rahman's opinion more accurately
represented Plaintiff's functional capacity with regard to her
mental impairment.  (R. at 20-21)

   Plaintiff argues that the ALJ's findings regarding the
severity of Plaintiff's depression are not supported by the
record.  See Plaintiff's Mem. at 14.  Specifically, Plaintiff

19

asserts that the reasons given by the ALJ for rejecting "the
consistent functional limitations set forth by Drs. Frieder and
Parsons ...," id. at 14-15, are not supported by substantial
evidence.  Those reasons were: 1) that it was only after her
disability claim was denied and she obtained legal representation
that she alleged mental health problems (R. at 21); 2) that
Plaintiff has never received psychiatric treatment, had a
psychiatric hospitalization or crisis intervention or taken
psychotropic medication even though Dr. Frieder recommended
treatment for her depression (id.); 3) that it was reasonable to
expect, in light of the recommendations from the psychologists,
that Plaintiff's level of functioning would improve with
treatment and medication (id.); and 4) that the ME, Dr. Rahman,
had reviewed the medical record in its entirety and had taken
into consideration in all three psychological examinations as
well as the physical findings of Plaintiff's examining and
treating physicians (id.).  The court finds each of these reasons
to be supported by substantial evidence and declines to remand on
this issue.

    Plaintiff did not originally claim depression as a basis for
her disability (R. at 21, 113), a point the ALJ specifically
noted (R. at 21).  Plaintiff argues that this fact is not a
proper basis to reject the opinions of Drs. Frieder and Parsons
because evidence of her depression was presented to the ALJ, and
she cites Hawkins v. Chater, 113 F.3d 1162, 1164 n.2 (10th Cir.
1997) in support of this proposition.  See Plaintiff's Mem. at 15
In Hawkins, the claimant alleged that she was disabled because of
hypertension, arthritis, and depression, but had not listed
depression on her application for disability.  See Hawkins, 113
F.3d at 1164.  In a footnote, the Tenth Circuit indicated that
the issue of claimant's depression was properly before the ALJ
because the evidence the claimant had submitted showed a history

of prescriptions for anti-depressant medication and because the
claimant testified she was depressed.  See id. at 1164 n.2.

The court does not read Hawkins as holding that an ALJ may
not consider the fact that a claimant's allegation of mental
impairment appeared only after his or her application for DIB was
denied in deciding what weight to give to the opinions of
examining psychologists, especially where the claimant is
referred to the psychologist by his or her attorney (R. at 256).
Plaintiff's suggestion that it was improper for the ALJ to
consider all of the circumstances surrounding Plaintiff's claim
of mental impairment is rejected.

Plaintiff also argues that her lack of treatment is not a
basis to discredit evidence regarding the severity of her
depression.  See Plaintiff's Mem. at 16.  To the extent that
Plaintiff is contending that an ALJ may not consider a claimant's
failure to seek treatment and the likelihood that the treatment
would be helpful, the court disagrees.

In Irlanda Ortiz v. Secretary of Health & Human Services,
955 F.2d 765 (1st Cir. 1991), the Court of Appeals considered the
significance of a claimant's failure to seek treatment:

> there is no record of any other mental health therapy
> during his insured status.  As a result, there is no way
> of telling whether psychiatric treatment could have
> improved these "marked" limitations.  **We do not think
> that a claimant with a diagnosed impairment may assert
> entitlement to disability benefits without at least
> securing a determination concerning what, if any,
> treatment options are available to him or her.**  Indeed,
> "[i]mplicit in a finding of disability is a determination
> that existing treatment alternatives would not restore a
> claimant's ability to work."

Irlanda Ortiz, 955 F.2d at 770 (bold added)(quoting Tsarelka v.
Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir.
1988))(alteration in original); see also 20 C.F.R. § 404.1530(a)
(2005)("In order to get benefits, you must follow treatment

21

prescribed by your physician if this treatment can restore your ability to work."); cf. SSR 96-7p, available at 1996 WL 374186, at *7 (July 2, 1996)("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints ...").

Here the examining psychologists reported that treatment may, in fact, aid Plaintiff's depression.  Dr. Frieder opined that Plaintiff "would benefit from psychiatric evaluation/ psychotherapy and might be a candidate for treatment with antidepressant medication."  (R. at 221)  Dr. Parsons found that a "psychiatric evaluation and ongoing psychotherapy would also be of some assistance."  (R. at 262)  Based on the case law and regulations stated above, it was proper for the ALJ to consider the absence of any treatment in determining the weight to be given to the opinions of Drs. Frieder and Parsons.

Plaintiff contends that the ALJ failed to note evidence that she could not present for treatment due to the loss of health insurance and the inability to afford counseling.  See Plaintiff's Mem. at 16 (citing R. at 233, 246).  In support of this argument, she cites Regennitter v. Commissioner of Social Security Administration, 166 F.3d 1294, 1299 (9th Cir. 1999), in which the court held that a claimant's failure because of his poverty to seek treatment by any mental health professional was not a valid reason for the ALJ to reject a psychologist's opinion.  However, at the administrative hearing Plaintiff testified that she did not seek mental health treatment because Dr. Frieder told her not to begin treatment until after she was evaluated by other specialists and that she was waiting for someone to tell her with which doctor to treat (R. at 51-52). The ALJ was entitled to resolve this conflict in the evidence, see Irlanda Ortiz, 955 F.2d at 769, and to conclude that poverty was not one of the reasons Plaintiff did not seek treatment for

depression.

The ALJ was justified in giving greater weight to Dr.
Rahman's opinion than to the opinions of Drs. Frieder and
Parsons.  "State agency medical and psychological consultants are
highly qualified physicians and psychologists who are experts in
the evaluation of the medical issues in disability claims under
the Act."  SSR 96-6p, available at 1996 WL 374180, at *2 (July 2,
1996).  In "appropriate circumstances, opinions from State agency
medical and psychological consultants and other program
physicians and psychologists may be entitled to greater weight
than the opinions of treating or examining sources."  Id. at *3;
see also Berrios Lopez v. Sec'y of Health & Human Servs., 951
F.2d 427, 431 (1st Cir. 1991)("[A]n advisory report such as those
submitted by [two non-testifying, non-examining physicians] is
entitled to evidentiary weight, which will vary with the
circumstances, including the nature of the illness and the
information provided the expert.  In a related context we have
held that the testimony of a non-examining medical advisor--to be
distinguished from the non-testimonial written reports in the
instant case--can alone constitute substantial evidence,
depending on the circumstances.")(citations and internal
quotation marks omitted); Lizotte v. Sec'y of Health & Human
Servs., 654 F.2d 127, 130 (1st Cir. 1981)("[I]t is clear that it
is within the [Commissioner's] province to accord greater weight
to the report of a medical expert commissioned by the
[Commissioner].");  Lewis v. Barnhart, No. 04-62-B-W, 2004 WL
2677211, at *5 (D. Me. Nov. 24, 2004)("[T]he administrative law
judge committed no error in choosing to credit the RFC assessment
of a non-examining consultant ... over that of an examining
consultant ....").

The reasons the ALJ gave for according more weight to Dr.
Rahman's opinion than to Dr. Frieder's and Parson's opinions are

23

valid.  Dr. Rahman is board certified in psychiatry (R. at 21,
31), and he reviewed Plaintiff's entire medical record (R. at
21).  It is also true that "there is no reason to question the
objectivity of his opinions."  (R. at 21)  Plaintiff's claim of
error on this ground is rejected.

### C.   The ALJ's Finding Regarding Plaintiff's Credibility

Lastly, Plaintiff challenges the ALJ's finding that "the
objective medical evidence is consistent with moderate
limitations," Plaintiff's Mem. at 18 (citing R. at 18-19), and
that "to the extent that [Plaintiff] alleges a disabling level of
pain, her statements are found to be less than fully credible and
are not persuasive," id. (citing R. at 19).  Plaintiff asserts
that she "experiences more than 'moderate limitations' from her
pain."  Id.  She cites the opinions of Dr. Viccione, her treating
physician, and Dr. Clough that her symptoms are severe, that her
severe pain is caused by medically determinable impairments, and
that her pain is "of such severity as to preclude sustained
concentration and productivity which would be needed for full-
time employment on an ongoing basis."  Id. (citing R. at 214,
235).

The court has already found that the ALJ's determination
that Plaintiff has the RFC to perform a wide range of sedentary
work is not supported by substantial evidence.  In light of this
finding, the court is unable to determine whether the ALJ's
credibility assessment is supported by substantial evidence.
Accordingly, the ALJ is directed to revisit his credibility
determination after the entire record has been reviewed by a
qualified physician.

### Summary

The ALJ's determination that Plaintiff has the capacity to
perform a wide range of sedentary work is not supported by
substantial evidence because: 1) there is uncontroverted medical

opinion that Plaintiff can only sit and/or stand for one hour before needing to lie down (R. at 234); 2) the RFC found by the ALJ which allows for sedentary work is unsupported by any assessment from a physician who has reviewed the entire record; and 3) the ME testified that the record supported the conclusion that Plaintiff would not be able to complete a full day of employment (R. at 36, 56). Given these circumstances, before determining Plaintiff's RFC, the ALJ should have obtained an RFC assessment from a qualified physician who had reviewed Plaintiff's entire record. Accordingly, the matter must be remanded. On remand, the Commissioner is directed to obtain the specified assessment and to make a new determination of Plaintiff's RFC.

Plaintiff's claim of error regarding the ALJ's assessment of Plaintiff's mental impairment is rejected. Substantial evidence supports the ALJ's determination to disregard the functional limitations opined by Drs. Frieder and Parsons.

Finally, given the court's conclusion regarding the ALJ's RFC finding, the court is unable to determine whether substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints regarding her physical and mental limitations were not totally credible. On remand, the ALJ is directed to revisit his credibility finding once the assessment specified above has been obtained and Plaintiff's RFC has been redetermined.

## Conclusion

For the reasons stated above, the court finds that the ALJ's decision that Plaintiff is not disabled is not supported by substantial evidence in the record. Accordingly, Plaintiff's Motion for Summary Judgment is GRANTED to the extent that the matter is remanded to Commissioner for further proceedings consistent with this Memorandum and Order. Defendant's Motion to Affirm is DENIED.

So ordered.


ENTER:                                      BY ORDER:

David L. Martin
United States Magistrate Judge              Deputy Clerk
September 30, 2005